Nasrallah v. U.S. Attorney General Helen Parsonage Good morning, Your Honors. May it please the Court. My name is Helen Parsonage, for the petitioner Nidal Nasrallah. At stake fundamentally in this case is whether a young man should be deported to face torture, death, or persecution because he's a member of a minority religious group in a country that is run by Hezbollah, one of the most dangerous and extreme Our primary argument is that the hearing in this case, and my client was deprived of due process in his hearing in the immigration court because of a bias and extrajudicial opinion forming by the judge who heard his case. As we lay out in the brief, this judge from the very beginning in the bond hearing and through the entire case referred constantly to connections, you know, tenuous or possible connections between my client and terrorism because of the conviction that he had, despite the fact that the group of terrorists that she referenced several times and were included in some of the materials is the very group from which my client was seeking protection of asylum withholding or ultimately the Convention Against Torture. And the way in which this bias influenced my client's hearing was particularly clear when it came to the judge's determination of whether my client was barred from committing this crime. Now the crime in question, Your Honor... I thought what the immigration judge was doing was evaluating whether your client's conviction for cigarette trafficking was particularly serious. The IJ was obliged to do that, right? Yes, Your Honor. And when he did that, the immigration judge said, among other things, that all participation in the black market runs the risk of supporting organized criminal groups and terrorist organizations and that the illegal sale of cigarettes is a recognized law enforcement problem. That's true, isn't it? That is true, Your Honor. However, the consistent application of a terrorist analysis to my client throughout his entire proceedings... That's referred to terrorism. He also referred to organized criminal enterprises and he said it runs the risk of supporting those kinds of activities. That's true, right? That doesn't deny your client due process to say something like that that's true. I think you have to take her comments in context, Your Honor. This was the very first time... There is an affidavit from a witness at the very first hearing, which is not recorded being a bond hearing, that almost the first thing she said in reference to my client when he appeared before her was some reference to whether there was going to be terrorism involved. And all the way through to the very last thing that she said to my client, which was that basically, you know, to paraphrase, basically, well, the government hasn't managed to convince me of material support. Well, your client wanted to avoid removal because of alleged fear of terrorist groups, right? That is correct, yes. So bringing up that, mentioning terrorism in this context, is not nefarious, is it? Mentioning terrorism in direct connection with my client, as in an inference that he was involved in terrorism, is very different from raising the issue of terrorism in terms of his credible fear of being deported to Lebanon. The operation that your client was involved in was not just small time. Am I right that he paid the undercover agents like $387,000? That is correct, Your Honor. I'm not contesting the facts as set out in the criminal matter. What I am saying is that, I mean, when you look at the case history of particularly serious crime, for a property crime and for a possession of stolen goods crime to be found to be a particularly serious crime is extraordinarily unusual. In fact, I was hard pushed to find any property crimes. But he was told by these agents undercover that cigarettes were obtained in violent encounters, hijackings and robberies, wasn't he told that? He was told that at one point the purported thieves of these cigarettes had been shot at by a security guard. That was a mischaracterization by the judge and by the government that there was an encounter involving firearms. They told him simply that they were shot at by a security guard. Let me ask you one other question on the fear of being tortured if he were sent back to Lebanon. Didn't your client in 2008 voluntarily return to Lebanon for a funeral for a couple of weeks? Yes, Your Honor, he did. And there are many cases where individuals are granted asylum and withholding and deferral of removal under the convention where they have returned for a very short period of time for a very compelling reason. And as my client testified at his hearing, kept an extremely low profile in order to avoid drawing any attention to his return to Lebanon. But he wasn't in fact harmed, was he, when he was there for a couple of weeks? No, he was there for say just a couple of weeks, in and out, very surreptitiously, very quietly to attend an important family event. That's quite different, I would suggest, from being there for an extended period of time after removal to that country where he would be there for a good length of time, obviously. Is there anything in the record that he's Druze, is that correct? That's correct, Your Honor. Not every Druze in Lebanon is being tortured, are they, by Hezbollah? No, and I don't think the standard has to be that every individual of a particular religion is going to be targeted. But if the religious group is targeted as a group, and when you compound that with his deep ties to the United States, not only from his lengthy presence, but the fact that his entire family is here, many of whom have asylum, when you combine those two things, what it means, it increases the likelihood. We're only looking at odds, we're not, 100% certainty is not required, and 100% rate of persecution against any particular group is not required under the law. It's got to be more likely than not. Yes, Your Honor, but not, that doesn't, I don't, that means that members of that group, and he as an individual, are more likely than not to be targeted. It does, again, that does not require a showing that every single Druze in Lebanon has been targeted. That would be 100% odds, which is not required under the law. But what is required at this stage is that the record compel the conclusion that he would likely be tortured. That is the standard of review for a convention against torture, yes, Your Honor. You know, our principal argument is that my client should have been permitted to present his case for withholding of removal based on an erroneous finding of a particularly serious crime. And I would, you know, on the particular... When we review that, we're really, we only, though, really have jurisdiction to review an error of law, don't we? Well, I think the standard of review for a particularly serious crime is one that is somewhat up in the air in the circuits at the moment. If I may address that. Obviously, 1252 does not bar your review of a particular social group, and that's because the statute itself does not specifically leave the decision to the discretion. If we look at what the Supreme Court... Does the IJ take the offense in that way, the facts that occurred? He's involved in this stuff for about nine months. Your Honor, you know, the Supreme Court has said that the determination of whether something is in the discretion of the AG depends on the specific provision of discretion in the statute. And in a related section, the Supreme Court held in Kuchana v. Holder, I hope I'm pronouncing that correctly, that the words had to be specifically there, that the word discretion has to be in the statute, because it's put in the statutes all over the place. But in these two statutes, the asylum and withholding statutes, the Congress used the word decide and determined. And they did not say in his discretion or may. They said decide and determined. And in fact, four of your sister circuits... crime is inherently discretionary, hasn't it? The Ninth Circuit's decision I find slightly puzzling in the sense that on the one hand, the Ninth Circuit in Arbid held that they had jurisdiction to review it. Therefore, it's not clearly a purely discretionary decision. Otherwise, it would have been taken out of the ambit of judicial review. And yet then they applied the abuse of discretion standard. Let me clear that up for you. That happens all the time. It may well be that in exercising the discretion that the tribunal, in this case an immigration judge, considers some kind of legally impermissible factor, so committed some kind of legal error that guides its discretion, but it nevertheless exercises discretion insofar as it considers legally appropriate factors. It's weighing of those factors in making a decision that is discretionary would then be beyond our review. I see I'm out of time, Your Honor, to answer the question. I think in answer to that, I would paraphrase this court's decision in Jean-Pierre versus the AG where they said whether a particular fact pattern amounts to, in that case torture, or in this case particular serious crime, requires the court to apply a legal definition to a set of undisputed or unadjudicated facts. And the Third Circuit has agreed with that, has applied that in the particular social group and in Infanti versus AG, and they applied the de novo standard of review to a particular social group. Is that a determination of mixed question of law and fact? It is, Your Honor, yes. Okay. So I think that's what Judge Pryor is driving at. Okay. When the judge is deciding, you can say to the judge, you can have a rule which says you only look at the statutory definition. You don't consider anything else. Once you say that you can consider other matters, how the IJ goes about amassing the facts from which the decision is made is all discretionary, isn't it? Well, I think not. I mean, if you're looking at a mixed question of law and fact, then you're really looking at the asylum standard of substantial evidence. I think that, you know, I would invite this court to consider a different standard than abuse of discretion based on the Third Circuit and the Sister Circuit's application of Kachana. And if I am out of time. Well, you've saved rebuttal. I've saved rebuttal, yes. Okay. Thank you very much. Mr. Remnitz. May it please the Court, Your Honors, Tim Remnitz on behalf of the United States Attorney General. I'd like to first start with the Court's questions about the jurisdictional bar that may be implicated in this case. There is a discretionary bar at 1252A2BI. The government is not asserting that that applies to the particularly serious crime determination in this case. The government actually agrees with Petitioner's Counsel that it's post-Kachana that does not apply to particularly serious crime determinations anymore. When the government advocates for jurisdictional bars for particularly serious crime determinations, we're usually looking at a criminal review bar in 1252A2C, which we don't have applicable in this case either because there's only one crime involving moral turpitude. So we are not advocating for any jurisdictional bar, but we are stating that the standard of review for this discretionary determination is abuse of discretion. Well, you know, here's the thing. We have to determine whether we have jurisdiction to review decisions no matter what you think. Okay, and it seems to me that the determination of whether something is a particularly serious crime is discretionary and not necessarily a legal decision. And if so, then we lack jurisdiction to determine it, don't we? The government agrees it's post-Kachana. It's not specifically described within the statute in 1252A2BI. Say that again? The government agrees what? With Fishner's counsel that post-Kachana, that Supreme Court decision, that the jurisdictional discretion is not specifically described under 1252A2BI to be a discretionary decision under that statute. And it simply says under particularly serious crime statute, an agency shall determine whether it's a particularly serious crime. And without that specific language that's discretionary, we don't advocate for application of the discretionary bar. The court is free to apply it, but we don't push that argument any longer. Well, the statute commands that the I.J. do the job, but then in doing it, the I.J. exercises discretion. Would you agree with that? I agree with that. And how you go about making the decision. I agree with that. It's just the litigation position of the Department of Justice that we don't put forward that argument any longer post-Kachana. So we argue for abuse of discretion. But your point is a legal question. It's subject to review. Our point is that it's a discretionary determination. It's just not subject to a jurisdictional bar where you're limited. That's what I mean. Yes. So you review whether or not the board abused its discretion in applying or determining whether or not this conviction was a particularly serious crime. And that involves weighing three factors in this case, which is what the board has explained under matter of NAM and matter of Francescu. You balance the nature of the conviction, the circumstances underlying the conviction, and the sentence imposed, and you weigh those factors to determine whether or not there is a particularly serious crime. And we would argue under this standard of review, abuse of discretion, which means that to overturn the agency's decision, it has to be arbitrary and irrational without reason to explanation, that the agency had clear, reasonable explanations for why they found this to be a particularly serious crime. So starting with the circumstances underneath the conviction, as the panel previously pointed out, there was violent encounters in each one of these charges the petitioner pled guilty to. So he believed that in Counts 6 and 7 indictment, which he was found guilty of, that he exchanged large amounts of cash to what he believed was a sophisticated criminal enterprise on the other end, and that violent encounters incurred each time to obtain the stolen goods to which he was purchasing. That's the circumstances of the crime, violent nature of the crime. It's not simply a property crime as petitioner describes it. Meanwhile, you have the nature of the conviction as well, which is the background documentation. This is a documentation that shows that cigarette trafficking became a large problem in the United States. It became linked to organized crime, not just terrorism, but drug cartels, mafia, organized crime in general, because of the low penalties and the failure by law enforcement initially to take it seriously. And meanwhile, there was massive profits that could be gained. So that was why it became, by nature, cigarette trafficking is a very serious crime, because it fuels these black market entities, these criminal enterprises that present a large danger to the community wherever they're encountered, wherever these criminal organizations are active. So it could be terrorist cells, it could be drug cartels, it could be just gangs in general. But petitioner shows a willingness to contribute large amounts of cash to a sophisticated criminal organization on the other end. And that is, by nature, particularly serious to the community around him. And then you have the underlying circumstances, which I mentioned, which were violent in themselves, and the board looked at these two factors and with good reason, we believe, found this to be a particularly serious crime. And there is a sentence imposed. That's the final factor. Petitioner notes in their brief that he got a one-year sentence initially, then he was able to modify his sentence to 364 days. But as the board explained, a matter of NAM, that the sentence imposed is not always the most salient factor to look at in this particularly serious crime of termination, because it can reflect things like judicial or legal priorities, like plea bargaining, cooperation with authorities, and offender characteristics, in this case, perhaps young age, that he was a student. It's not always reflective of a serious or sensitive crime. So we believe that the, certainly with not an abusive discretion in finding that it was a particularly serious crime in this case. We also, did the court have any questions? Let me back up a moment to the jurisdictional question, which is, so I understand your point that the Supreme Court has said that a discretionary, what we all kind of agree is a discretionary determination here, might nevertheless be reviewable. But wouldn't it have to be reviewable for a legal error? Yes, it's reviewable for legal error. It's reviewable for abusive discretion. It's reviewable for both of those things. Well, a legal error would be an abusive discretion, so it's a bit circular. I guess my point is, if in the exercise of its discretion, the IJ did not consider any kind of impermissible legal factor, then anything beyond that would be beyond our review. Is that not right? The court can review that legal claim, and it can review the weighing of factors in this case. So we're saying you can review both. Weighing itself could be a legal error. No, a legal error can be how it applied to law. You could make that finding. Doesn't the jurisdictional bar, though, say that we can only review for legal errors? Right, and so we don't advance that jurisdictional bar applies. If it did apply, the court would be limited to legal errors, questions of law, and constitutional claims. But the court is not so limited. At least the government is not arguing the court is so limited in its review. You can review whether or not the immigration judge abused her discretion in making this determination, not just whether the— In the ultimate decision. In the ultimate decision, yes. In the ultimate decision. Yes. But getting there, the IJ and the board applied the law. That's the point of the matter. They could make the argument, you can review that, they misapplied the law or a claim of immigration judge bias, for example. Or make clearly erroneous fact findings. Pardon me? Either way. Can you repeat that, please? The IJ could make an error, either a legal error or there's not sufficient facts to support the decision. Yes, and you could, if the court found that to be the case, it could reverse on that ground. But it could also find that the board simply abused its discretion and the record does not support the immigration judge's decision, that they did not look at the nature of conviction, that it didn't add up to a particularly serious crime. So if the jurisdictional bar did apply, though, it would only be the court would be limited to legal claims such as that or constitutional claims such as immigration judge bias. We're not arguing that the court is so limited, though. So if we're not so limited, then it's a de novo review? Is that what you're saying? No, it's a review for abuse of discretion. So similar to when the court reviews a denial of a motion to reopen, which is a discretionary determination, you review that for abuse of discretion. This is a discretionary determination. The court reviews it for abuse of discretion. Okay. So the government also argues that the petitioner did not establish a clear probability of torture in Lebanon. That standard review is, as the court noted, the record has to compel conclusion contrary to the agency. And in this case, petitioner failed to establish a cat claim in this case because, one, as the panel noted, petitioner's own actions undermine that there's a clear probability of torture in Lebanon. After the first, the only instance in this record where petitioner encountered Hezbollah in 2005, petitioner voluntarily remained in Lebanon for a year after that to finish school. He was unharmed or unencountered by Hezbollah within that year. Then he came to the United States, adjusted status to lawful permanent resident, and voluntarily returned to Lebanon in 2008, where he again was unharmed. And also you have petitioner's testimony, which there's an encounter in the transcript where he admits that he's relatively safe in the Druze-dominated area of Lebanon called the Shouf, which is where he is from. He simply did not want to live there because economic opportunities were limited there. So, and then you also have background evidence. He submitted a document called a note on the Druze in Lebanon, which also acknowledges the Druze have relative security in Lebanon, and they're not discriminated against in Lebanon either. So, in the end, what you have is his own testimony stating that he has, he is relatively safe in Lebanon. You have his own actions, which prove that he was relatively safe in Lebanon. He remained for a year after this incident or this encounter with Hezbollah in 2005, and he voluntarily returned there in 2008, and then finally a background documentation, which also show that the Druze enjoy relative security in Lebanon. Meanwhile, Hezbollah is not active throughout the entirety of Lebanon. The background documentation also shows that they are active in Beirut, and moreover, just a southern suburb of Beirut. And you'll see that also acknowledged in the immigration judge's opinion. So, to establish a clear probability of torture, you'd have to show in the absence of past torture, and the petitioner has not challenged the board's determination that there is no past torture in this case, you'd have to show there's a clear probability, more likely than not, that he will be tortured, have severe infliction of pain or suffering upon him throughout Lebanon. And you cannot show that. It's not in the background documentation. It shows that Hezbollah is active, at most, in Lebanon and in a small pocket, I mean in Beirut, in the southern suburbs of Beirut, not the entirety of Lebanon. And also, regarding the Western ties connection, there's one document in the record, the U.S. Embassy report, which discusses Western ties, and it says that U.S. citizens might be at risk of kidnapping in Lebanon. The petitioner is not so similarly situated. He's not a U.S. citizen, and he's from Lebanon. It doesn't speak, it doesn't discuss individuals who are from Lebanon and whether they have a similar risk of being kidnapped for ransom in this case. We still have to show it's more likely than not, and the record compels that conclusion, contrary to what the agency found. And the government does not believe petitioners met that standard. If the court has any further questions. I think we have your position. Thanks. Ms. Parsons. Thank you. I don't have a lot to add. I think I've made most of my points. I did just want to, in response to that last comment, note that in pages 690, following of the record, there is a report from David Saperstein, a rather well-known ambassador at large for international religious freedom, in which he stated that in 2016, the Druze is the latest religious minority in the Levant to suffer the wrath of Islamic extremists. That was one of the reports on which the immigration judge based her grant of cat relief, and I would just draw attention to the fact that it's not quite as rosy as the government would like you to believe. And if there are no further questions, I'll rest. Thank you very much. Thank you very much. Next case. PSG versus Ironshore.